UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

JEFFREY A. CHRISTIE, *et al.*,

       Plaintiffs,

v.                                        CASE No. 8:13-CV-1371-T-23TGW

BANK OF AMERICA, N.A.,
*et al.*,

       Defendants.

_____

## REPORT AND RECOMMENDATION

      The plaintiffs have filed a Motion for Class Certification and Supporting Memorandum of Law (Doc. 169), seeking to represent a class of individuals that are in foreclosure proceedings and have had force-placed insurance on their homes.[1] The plaintiffs contend that the defendants have breached contracts, breached an implied duty of good faith and fair dealing, breached a fiduciary duty, were unjustly enriched, and violated the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §501.201, et seq.[2]

---

[1] Citation of page numbers corresponds to the page numbers in CM/ECF.

[2] The plaintiffs have asserted individual claims for violation of the Real Estate Settlement Procedures Act, 12 U.S.C. § 2601, et seq. (Doc. S-136, pp. 32-34, ¶¶128-133). The plaintiffs do not seek class certification of this cause of action.

The plaintiffs have not satisfied the prerequisites for certification of a class action in several respects. I therefore recommend that the motion for class certification be denied.

I.

On September 15, 2006, Jeffrey A. Christie and Cherrie Christie executed a mortgage and a promissory note in favor of Bank of America, N.A. ("BANA"), for real property located at 13818 Peace Boulevard in Brooksville, Florida (see id.).[3] The plaintiffs signed a promissory note that was secured by a mortgage in the amount of $520,780 (see Doc. 169-1, Ex. 1). The plaintiffs stayed current on their loan payments until 2008 when Cherrie Christie became disabled (Doc. S-136, p. 7; Doc. 169-3, Ex. 5, Cherrie Christie decl., p. 4, ¶4, Ex. 5, Jeffrey A. Christie decl., p. 38, ¶4).[4] The plaintiffs stopped making payments on their loan in 2008. After attempting to unsuccessfully modify their loan payments, the plaintiffs moved out of their home and into a rental home.[5]

---

[3]Defendant BAC Home Loans Servicing, LP ("BAC"), is a servicer of mortgage loans (Doc. S-136, p. 3, ¶14). The plaintiffs allege that their mortgage was owned and serviced by BANA and/or BAC (id., p. 4, ¶19).

[4]The plaintiffs' last mortgage payment was in July 2008, for the June 2008 payment (Doc. S-185-5, Jamie Cooper decl., p. 2, ¶9, see Ex. A, p. 11).

[5]The plaintiffs wrote a letter to BANA explaining their situation and that they left the home because "we are honest people and did not feel it was right to stay in our home

On September 18, 2009, Citizens Property Insurance Corporation notified BANA by letter that the plaintiffs' hazard insurance on the property was cancelled because they no longer resided at the property (Doc. S-185-5, Jamie Cooper ("Cooper") decl., pp. 2-3, ¶10, Ex. B).[6] Thereafter, on October 26, 2009, BANA sent the plaintiffs a letter informing them they were still obligated to maintain hazard insurance on the property (Doc. S-185-5, Cooper decl., p. 3, ¶11, Ex. C, p. 25). The letter warned the plaintiffs that BANA would obtain lender placed insurance ("LPI"), otherwise known as force-placed insurance or hazard insurance, for a year if they did not obtain coverage themselves (Doc. S-185-5, Ex. C, p. 25). The letter informed the plaintiffs that BANA would obtain insurance costing $10,674.13 to cover the property for $428,500 (id.). The letter also indicated that the insurance coverage would be charged to their escrow/impound account and that their monthly payments would be adjusted accordingly (id.).[7] BANA purchased

_____

if we could not pay for it and live there free ..." (Doc. S-136, Ex. H, p. 1). The letter also informed BANA that it "need[s] to protect the home from vandalism, since the house was hidden by great oak trees and was sitting far off the road's view[]" and that they "tried to protect the home [], but ... thought it was just too dangerous" after the police caught "a[n] armed crack head" on the property (id.).

[6]On September 18, 2009, Citizens Property Insurance Corporation sent BANA a letter notifying it that the insurance policy was cancelled effective September 8, 2009, at 12:01 a.m. (Doc. S-185-5, Ex. B).

[7]The letter stated:

The coverage that we purchase will be different than your current policy and

the insurance through Balboa Insurance Company ("Balboa") for September 2009 through September 2010 (Doc. S-136, pp. 8-9, ¶44).[8]

BANA subsequently purchased five additional hazard insurance policies for the years of 2010, 2011, 2012, 2013, and 2014 (Doc. S-185-5, Cooper decl., p. 3, ¶12, Ex. A, pp. 12-13). The insurance premium amounts respectively were $10,674.13, $10,507.19, $11,763.26, $6,511.54, and $6,511.54 (id.). The plaintiffs' escrow account was debited for those amounts (id.). In total, BANA paid over $56,000 for the hazard insurance policies.

On April 30, 2009, BANA filed a foreclosure suit against the plaintiffs for the property (Doc. S-185-5, Cooper decl., p. 4, ¶14). On February 8, 2012, a foreclosure judgment was entered on the property with a sale date of March 26, 2012 (id.). The day after the foreclosure, the Department of Justice and BANA entered into an agreement that provided relief to borrowers in foreclosure suits (id., ¶15). Consequently, BANA

---

in most cases is more expensive and will not protect you as fully as a policy you could purchase. ... It is really very important that you attempt to obtain coverage immediately to avoid this lender placed coverage. If we must go forward with purchasing this coverage, the charges will be charged to your escrow/impound account and your monthly payment will be adjusted accordingly (Doc. S-185-5, Ex. C, p. 25).

[8]The plaintiffs' Third Amended Class Action Complaint explains that the insurance "policies were issued by Balboa Insurance Co., QBE Speciality Insurance Company (a subsidiary of Balboa Insurance Co.'s purchaser), and Praetorian Insurance Co. (Balboa Insurance Co. renamed)" (Doc. S-136, p. 9, ¶46).

placed the plaintiffs' foreclosure on hold and, thereafter, on February 27, 2012, moved to vacate the plaintiffs' foreclosure (id., ¶¶16, 17). On March 6, 2012, the foreclosure was vacated and the pending foreclosure sale was cancelled (id., ¶17).

Thereafter, BANA contacted the plaintiffs about the loan modification program (id., ¶18, Ex. E, pp. 31-32).[9] The plaintiffs were approved for a loan modification (Doc. S-185-5, Cooper decl., p. 5, ¶19, Ex. F, p. 40). However, the plaintiffs had to make three trial payments in order to obtain the loan modification. The plaintiffs did not make any trial payments. If they had, their principal loan balance would have been reduced by approximately $432,398.45, with a reduced interest rate of 2.00 percent on the loan (id., p. 5, ¶19). Also, all of the late fees on the loan would have been reduced, and the loan made current by adding to the principal loan the advances that BANA had made on the plaintiffs' behalf (id.). BANA

---

[9]BANA's letter dated June 8, 2012, stated:
    We are pleased to tell you that you meet the criteria required to apply for a new modification program recently announced as a result of the U.S. Department of Justice and State Attorneys General global settlement with major servicers, including Bank of America, N.A. We encourage you to apply since this modification program could provide qualified customers significant principal reduction and reduce monthly payments by an average of 35% (Doc. S-185-5, Ex. E, p. 31).

ultimately denied the loan modification (id., ¶20, Ex. G, pp. 47-48).[10]  The

balance on the loan as of January 6, 2012, was $680,759.09 (Doc. 169-2, Ex.

3, p. 4).

The dispute between the parties centers around section five of

the mortgage pertaining to property insurance.  The mortgage provides:

> Borrower shall keep the improvements now
> existing or hereafter erected on the Property
> insured against loss by fire, hazards included
> within the term "extended coverage," and any other
> hazards including, but not limited to, earthquakes
> and floods, for which Lender requires insurance.
> This insurance shall be maintained in the amounts
> (including deductible levels) and for the periods
> that Lender requires....
>
> If Borrower fails to maintain any of the coverages
> described above, Lender may obtain insurance
> coverage, at Lender's option and Borrower's
> expense. Lender is under no obligation to purchase
> any particular type or amount of coverage.
> Therefore, such coverage shall cover Lender, but
> might or might not protect Borrower, Borrower's
> equity in the Property, or the contents of the
> Property, against any risk, hazard or liability and
> might provide greater or lesser coverage than was
> previously in effect.  Borrower acknowledges that
> the cost of the insurance coverage so obtained
> might significantly exceed the cost of insurance
> that Borrower could have obtained.  Any amounts

---

[10]By letter dated December 5, 2012, BANA informed the plaintiffs that "[y]our loan is not eligible for a modification because you did not make all of the required Trial Period Plan payments on time" (Doc. S-185-5, Ex. G, p. 47).

disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

The mortgage further provides:

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. ... If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower....

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. ... In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage

> of the Property.   Lender may use the insurance
> proceeds either to repair or restore the Property or
> to pay amounts unpaid under the Note or this
> Security Instrument, whether or not then due.

(Doc. 169-1, Ex. 1, p. 6).

It is the plaintiffs' allegation that, according to the language of section five of the mortgage, at the time of foreclosure, the defendant should determine if repairs are economically feasible.  Further, within a reasonable time of making the decision to foreclose on the property, the defendant must apply insurance proceeds to reduce a mortgage's principal.  Specifically at the hearing, plaintiffs' counsel indicated that this decision should be made at the time the decision to foreclose is made.  The defendant argues there is no time limit and that the plaintiffs always get the benefit of the bargain.

After the plaintiffs left the property, the home was vandalized, many items were taken from the home and the property was damaged.[11] Thereafter, BANA and the plaintiffs made claims on force-placed insurance for the property.  BANA and the plaintiffs together have made six insurance claims on the property (Doc. S-185-2, Sonia Sanchez ("Sanchez") decl., p. 4,

---

[11]The home was vandalized and a person was convicted for the burglary of taking "construction materials, wiring and fixtures from the [p]roperty" (Doc. S-136, p. 10, ¶51).

It is also customary for BANA to conduct inspections of homes with "non-performing mortgages" (id., ¶50).

¶17).[12] Sanchez, the vice president and mortgage servicing unit manager for BANA's property claims department, explained that it is customary for LPI policy claims to be made payable to BANA as the beneficiary (id., p. 2, ¶5). She further explained that insurance money on a borrower's account is held until the funds are dispersed to either pay for repairs or to pay towards the principal on a loan (id., ¶¶6, 7, p. 3, ¶13). BANA received $43,256.73 in insurance proceeds from five claims, which it is holding on the plaintiffs' account (id., p.4, ¶17). Currently, BANA holds $41,593.47, on the plaintiffs' account from the collected insurance proceeds.[13]

Repairs were never done to the home. Apparently, the home was vandalized to the extent that it became unliveable and too costly to repair. In October 2012, the plaintiffs were in contact with BANA about the steps they needed to complete to obtain the insurance proceeds and to repair their home (id., p. 6, ¶¶24-25, see Ex. I, p. 97). On December 28, 2012, BANA received the plaintiffs' contractor's bid of $197,377.77 to repair the home (id., ¶27, p.

---

[12] According to Sanchez, the plaintiffs made two claims in September 2012 for vandalism and wind damage (Doc. S-185-2, Sanchez decl., p. 5, ¶22). However, the referenced exhibit only contains one letter to Jeffrey Christie regarding one claim (see Doc. S-185-2, Ex. G, p. 86).

[13] Sanchez explained that in total BANA received $43,256.73, in insurance proceeds but, deducted $1,663.26, paid to BANA's agent that makes insurance claims (Doc. S-185-2, Sanchez decl., p. 4, ¶18). Accordingly, BANA is holding $41,593.47 on the plaintiffs' account.

7, ¶28).[14]  Accordingly, the bid amount to make the needed repairs surpassed the amount of the obtained insurance proceeds.  Therefore, no repairs were completed on the home.

The plaintiffs filed their first complaint on May 23, 2013 (Doc. 1).  Thereafter, on November 12, 2014, the plaintiffs filed their Third Amended Class Action Complaint (Doc. S-136).  Subsequently, the plaintiffs filed a redacted version of their Motion for Class Certification and Supporting Memorandum of Law (Doc. 169)[15].  BANA opposes the class certification (Doc. S-185).  It contends that the plaintiffs cannot satisfy any of the requirements for certification of a class action under Rule 23, Fed.R.Civ.P. (id.).

The motion was referred to me for a report and recommendation (Doc. 178).  Thereafter, oral argument was held on the motion (Doc. 196).

_____

[14]According to the plaintiffs' Third Amended Class Action Complaint, there was substantial vandalism and damage to the home (Doc. S-136, p. 11, ¶53).  There was damage to the drywall, ceilings, light fixtures, and roof (id.).  Further, the home was missing various items, including appliances, insulation, painting, electrical wiring, copper piping, outlets, sinks, bathroom fixtures, fans, electrical panels, fencing, and gates (id.).

[15]On July 14, 2015, the plaintiffs filed the same motion for class certification under seal (Doc. S-160).  The motion was denied as moot (Doc. 167).

II.

"A class action may be maintained only when it satisfies all the requirements of Fed.R.Civ.P. 23(a) and at least one of the alternative requirements of Rule 23(b)." Allapattah Services, Inc. v. Exxon Corp., 333 F.3d 1248, 1260 (11th Cir. 2003) (quotations omitted). Federal Rule 23(a) requires:

> (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

The proposed class must also satisfy one of three subsections of Rule 23(b). In this case, the plaintiffs submit they have met the certification requirements under Rule 23(b)(2) and Rule 23(b)(3). Pursuant to Rule 23(b)(2), class certification is authorized when "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole[.]" Further, Rule 23(b)(3), authorizes class actions where "the questions of law or fact common to class members predominate over any questions affecting only individual members, and ... a class action is superior

to other available methods for fairly and efficiently adjudicating the controversy."

Furthermore, there is an implicit requirement of Rule 23 that the proposed class be "adequately defined and clearly ascertainable." Little v. T-Mobile USA, Inc., 691 F.3d 1302, 1304 (11th Cir. 2012). Thus, class members must be ascertainable by reference to objective criteria. Bussey v. Macon County Greyhound Park, Inc., 562 Fed. Appx. 782, 787 (11th Cir. 2014). Moreover, the analysis of objective criteria should be administratively feasible, which means that identifying class members is a manageable process that does not require much, if any, individual inquiry. Id.

As a general rule, the merits of a class action law suit are not considered. See Eisen v. Carlisle and Jacquelin, 417 U.S. 156, 177-78 (1974). However, the Supreme Court has explained that this rule is often applied incorrectly and therefore, this rule is not a complete bar to considering the merits of a case as it pertains to the class certification issue. Wal-Mart Stores, Inc. v. Dukes, 131 S.Ct. 2541, 2552 n.6 (2011). The Court explained that Rule 23(a) requires a court to perform a "rigorous analysis" (quoting General Telephone Co. of the Southwest v. Falcon, 457 U.S. 147, 160 (1982)), and, therefore, a plaintiff "must affirmatively demonstrate his

compliance with [] Rule [23(a)]" including "[proof] that there are in fact sufficiently numerous parties, common questions of law or fact, etc." Wal-Mart Stores, Inc. v. Dukes, supra, 131 S.Ct. at 2551. Accordingly, "sometimes it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question." General Telephone Co. of the Southwest v. Falcon, 457 U.S. 147, 160 (1982).

"Frequently, [the] 'rigorous analysis' will entail some overlap with the merits of the plaintiff's underlying claim." Wal-Mart Stores, Inc. v. Dukes, supra, 131 S.Ct. at 2551. Consequently, "the class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action." (internal quotations omitted) General Telephone Co. of the Southwest v. Falcon, supra, 457 U.S. at 160. This is particularly true when commonality issues overlap with the merits of the case. Wal-Mart Stores, Inc. v. Dukes, supra, 131 S.Ct. at 2551. Therefore, it is error to not look at the merits of the case in determining whether the requirements of Rule 23(a) are met. Comcast Corp. v. Behrend, 133 S.Ct. 1426, 1433 (2013).

III.

The plaintiffs' motion defines a proposed state-wide class as follows (Doc. 169, pp. 1-2):

> All persons who executed a Mortgage [which is a form contract described as "– Single Family – Fannie Mae/Freddie Mac UNIFORM INSTRUMENT"] that is held or serviced by one of the Defendants, where force placed insurance was placed on the property secured by the Mortgage, an insurance claim(s) was made directly by one of the Defendants or their agents (as opposed to the borrower) under the force placed insurance where one of the Defendants has received claim(s) proceeds from the force placed insurer and a foreclosure proceeding was initiated by one of the Defendants.

This class is not adequately defined because the definition does not work.

A.    In the first place, there is not even a limitation in the definition that excludes borrowers who received the full benefit of the insurance proceeds. Furthermore, despite what the plaintiffs argue in their motion, there is not a time limit in the definition by when the defendant must provide the benefits of the insurance proceeds to the borrower.

The plaintiffs assert in their motion that "the [p]laintiffs' position is that the proper reading of [section 5 of the mortgage] is the [d]efendants have the obligation to: 1) make a determination whether restoration/repair of

the property is economically feasible and will not lessen its security; 2) make this determination within a prompt period and prior to the [d]efendant instituting foreclosure proceedings; and 3) once the [d]efendants initiate foreclosure proceedings, immediately apply any force placed insurance proceeds that [d]efendants are holding to the unpaid mortgage balance and thereby reduce the amount of the outstanding loan balance by the amount of the insurance proceeds and recalculate the outstanding loan balance" (id., p. 3). The plaintiffs' position is unavailing for several reasons.

In the first place, section 5 does not require the defendant to apply any force-placed insurance proceeds to the unpaid insurance balance and recalculate the outstanding loan balance immediately upon initiating foreclosure proceedings. Thus, the language of section 5 cited by the plaintiffs in support of this argument merely states (Doc. 169-1, Ex. I, p. 7):

> Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly.... If the restoration or repair

> is not economically feasible or Lender's security
> would be lessened, the insurance proceeds shall be
> applied to the sums secured by this Security
> Instrument, whether or not then due, with the
> excess, if any, paid to Borrower. ...

There is nothing in this language which remotely indicates that the defendant must reduce the loan balance immediately upon initiating foreclosure proceedings.

Notably, I expressed this view in the hearing and suggested that before the burdensome administrative procedures of a class certification are undertaken, that a party raise the legal issue with the court. That, however, was not done. Nevertheless, I continue to have the opinion that, contrary to the plaintiffs' position, section 5 of the mortgage does not require the defendant to recalculate the loan balance immediately upon initiating foreclosure proceedings.

Furthermore, as the defendant points out (Doc. S-185, pp. 6-7), there is no allegation in the Third Amended Class Action Complaint that the defendant had an obligation to recalculate the loan balance immediately upon initiating foreclosure proceedings. In fact, the plaintiffs have pled, rather, that the defendant failed to apply force-placed insurance proceeds to the plaintiffs' "underlying mortgage debt within a reasonable amount of time"

(Doc. S-136, p. 22, ¶90g). Such an allegation is arguably supported by section 5 since it is not uncommon for a limitation of a reasonable amount of time to be implied in a contract. The defendant suggests that the plaintiffs have moved away from that argument because what constitutes a "reasonable" amount of time will vary in each case (Doc. S-185, p. 6), thereby creating problems of commonality. Regardless, the plaintiffs do not assert a reasonable time theory, but rather rely upon an unpled (and unsupported) theory of recalculation immediately upon initiating foreclosure proceedings.

The plaintiffs' approach is also deficient because the class definition does not include any criterion that the insurance proceeds must be credited to the borrowers immediately upon the initiation of foreclosure proceedings. Thus, the class definition does not even reflect the plaintiffs' theory. Accordingly, the class definition does not meet the threshold requirement that the class be adequately defined.

In sum, the plaintiffs' class action theory fails on several grounds: (1) it is not supported by section 5 of the mortgage; (2) it is not pled in the Third Amended Class Action Complaint; and (3) it is not reflected by the class definition. For these reasons, I recommend that the motion be denied.

B.    It is appropriate to add, nevertheless, albeit somewhat succinctly, that the defendant has persuasively shown that the motion should also be denied on grounds of lack of commonality and clear ascertainability.

1.    For example, the defendant points out that it makes a difference whether the borrowers have abandoned their property. Thus, the court has previously held that abandonment triggers the assignment provision which assigns to BANA the plaintiffs' rights to any insurance policies covering the property (Doc. 109, pp. 5-6). Consequently, "the Christies cannot assert a claim for the insurance proceeds or other rights under the policy . . ." (id., p. 6). Clearly, the plaintiffs have a legal hurdle that borrowers who did not abandon their home do not. In other words, those individuals have differing circumstances. However, there is nothing in the class definition that distinguishes between those two categories.

The defendant also asserts that it makes a difference whether an insurance claim was paid before or after a foreclosure proceeding was initiated. Thus, the plaintiffs' theory is that the defendant must apply any force-placed insurance proceeds to the unpaid mortgage balance once foreclosure proceedings are initiated. However, this theory does not account

for the circumstance where proceeds were paid out only after a foreclosure proceeding was initiated, and neither does the class definition.

The defendant indicates, in addition, that it would make a difference if insurance proceeds were applied for repairs. Again, the class definition does not account for this difference.

In reply, the plaintiffs do not attempt to negate the differences in the class that were identified by the defendant. Rather, they attempt to side-step those differences by asserting that the common issue is the interpretation of the form mortgage agreement (Doc. S-190, p. 2). If that is what this motion boils down to, there is no justification at this point of undertaking the administrative burden of a class action. As I have previously said, the plaintiffs' interpretation is not supported by the terms of the mortgage agreement, and is not even pled in the Third Amended Class Action Complaint.

2.     The defendant also argues persuasively that the plaintiffs have not met their burden of demonstrating that the class is clearly ascertainable (Doc. S-185, pp. 8-14).

As indicated, a threshold requirement under Rule 23 is that the proposed class must be adequately defined and clearly ascertainable. <u>Little</u>

v. T-Mobile USA, Inv., supra, 691 F.3d at 1304; Bussey v. Macon County Greyhound Park Inc., supra, 562 Fed.Appx. at 787. The class definition must contain objective criteria that permits class members to be identifiable "in an administratively feasible way." Karhu v. Vital Pharmaceuticals, Inc., 2015 WL 3560722 *1 (11th Cir. 2015); See Bussey v. Macon County Greyhound Park, Inc., supra, 562 Fed.Appx. 782 at 787. Administratively feasible, therefore, "means that identifying class members is a manageable process that does not require much, if any, individual inquiry." Bussey v. Macon Country Greyhound Park, Inc., supra, 562 Fed.Appx. at 787 (quotations omitted); see also Kharu v. Vital Pharmaceuticals, Inc., supra, 2015 WL 3560722 at *1.

The defendant points out that the proposed class definition contains nine criteria (Doc. S-185, p. 9). Of course, as previously explained, and as the defendant argues, the class definition is inadequate and needs additional criteria. Nevertheless, the defendant demonstrates that at least two of the plaintiffs' nine criteria do not permit class members to be identified in an administratively feasible way.

The plaintiffs have asserted in a conclusory manner that class members can be "easily and objectively identifiable through [d]efendant's own witnesses and computer systems" and that BANA's IBM A/S 400 (which

the defendant states is actually an IBM AS/400 (id., p. 10)) can be utilized to obtain loan information (Doc. S-160, p. 11).[16] The plaintiffs cannot merely point to BANA's computer system for their argument that the putative class is easily ascertainable. Karhu v. Vital Pharmaceuticals, Inc., supra, 2015 WL 3560722 at *3; Alhassid v. Bank of America, N.A., 307 FRD 684, 695 (S.D. Fla. 2015) (class not ascertainable where needed to do individualized loan inquiry). Thus, the plaintiffs must demonstrate that the defendant's records are "useful for identification purposes, and that identification will be administratively feasible." Karhu v. Vital Pharmaceuticals, Inc., supra, 2015 WL 3560722 at *3. The plaintiffs provide no explanation on the feasibility of extracting the necessary information. The defendant counters that in order to determine the class members, individual "loan-by-loan reviews" would be required of over 283,000[17] loans in Florida  (Doc. S-185, p. 12).

---

[16]Sandra Lea Giesseman, BANA's vice president and claims manager of loan administration, testified that there are several computer systems one can look at to determine a borrower's loan information, including document manager, discovery sites and the I series (Doc. S-161, Ex. 2, Sandra Lea Giesseman ("Geisseman") Dep., pp. 8, 17). Giesseman testified that the I series documents activity on the loan, including the "[o]rigination, unpaid principal balance at origination, unpaid principal balance, escrow balances, paid through dates ... insurance history, interest applied, fees due, balances, loan statuses..." (id., p. 18). It also documents if there are insurance claims (id.).

[17]BANA submits that the loan number is higher because it would also have to review archived loans (Doc. S-185, p. 12).

-21-

Thus, while the defendant concedes that some of the nine factors could be determined by a reasonable computer search, other criteria require individualized attention to documents in borrower loan files (id., p. 11). Thus, the defendant explains that some of the approximately 283,000 loans use the Fannie/Freddie forms referred to in the class definition, and some do not. Accordingly, the defendant would have to pull each of the 283,000 files to see whether a loan met that criterion.

Similarly individual file reviews would be needed to determine whether proceeds came from force-placed policies.   Thus, while the defendant's computer systems track insurance claims, they do not indicate whether claims proceeds came from force-placed insurance.

The plaintiffs' reply does not even mention the need to review each of 283,000 files to see whether a Fannie/Freddie form was used, and they have provided no satisfactory answer to the argument that the defendant would need to review all of the files to determine whether the proceeds came from force-placed policies (see Doc. S-190, pp. 7-8).   Accordingly, the plaintiffs have failed to show that identification of the class members is administratively feasible.

For these reasons, I recommend that the Plaintiffs' Motion for Class Certification (Doc. 169) be denied.

Respectfully submitted,

THOMAS G. WILSON
UNITED STATES MAGISTRATE JUDGE

DATED: January  7 , 2016

## NOTICE TO PARTIES

A party has fourteen days from this date to file written objections to the Report and Recommendation's factual findings and legal conclusions. A party's failure to file written objections waives that party's right to challenge on appeal any unobjected-to factual finding or legal conclusion the district judge adopts from the Report and Recommendation.  11th Cir. R. 3-1.